IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IRON RANGE CAPITAL PARTNERS, LLC | ) ) ) | Case No.: |
| Plaintiff, | ) | |
| v. | ) ) | Judge |
| OSPREY CAPITAL, LLC, DAVID H. HOFFMANN, and GREGORY D. HOFFMANN, | ) ) ) ) ) | Magistrate Judge |
| Defendants. | ) | **JURY DEMAND** |

## COMPLAINT

Plaintiff, **IRON RANGE CAPITAL PARTNERS, LLC**, by its undersigned attorneys, for its Complaint against Defendants, **OSPREY CAPITAL, LLC**, **DAVID H. HOFFMANN**, and **GREGORY D. HOFFMANN**, states as follows:

## NATURE OF THE ACTION

1. Iron Range Capital Partners, LLC ("Iron Range") brings this action against Osprey Capital, LLC ("Osprey"), David H. Hoffmann ("David"), and Gregory D. Hoffmann ("Gregory") (collectively, the "Defendants") seeking damages caused by the Defendants' perpetration of a scheme to defraud Iron Range in connection with the purchase and sale of securities in violation of the Securities Exchange Act of 1934. The Defendants fraudulently induced Iron Range to transfer to Osprey its exclusive right to acquire 100% of the outstanding capital stock of Orange Line Holdings, Inc. ("Orange Line") by, *inter alia*, promising Iron Range equity in Orange Line while secretly intending never to honor their promise.

2. Iron Range seeks judgment against the Defendants for damages for their violations of the Securities Exchange Act of 1934 (**Count I**). Iron Range also seeks judgment

1

against the Defendants for damages, attorneys' fees, and costs for their violations of the Illinois Securities Law of 1953 (**Count II**); common law fraud (**Count III**); breach of contract (**Counts IV and V**); unjust enrichment (in the alternative) (**Count VI**); and tortious interference with prospective economic advantage (**Count VII**).

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, because the securities fraud claims herein arise out of violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq*.

4. This Court has supplemental jurisdiction over Iron Range's remaining state law securities and common law claims under 28 U.S.C. § 1367(a) because the state law claims are so related to the federal securities fraud claims that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in the Northern District of Illinois under Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b)(1)-(2) because all defendants are residents of this district and of Illinois, and a substantial portion of the events giving rise to this action occurred in this judicial district.

## PARTIES

6. At all relevant times, Plaintiff Iron Range is and has been an Illinois limited liability company that maintains its principal place of business in Cook County, Illinois. Iron Range is an independent private equity firm engaged in the business of, *inter alia*, investing in companies for its own account. At all relevant times, Iron Range conducted business from, and its activities in connection with this action primarily took place in, the State of Illinois. The Managing Partner of Iron Range is Gary L. Stark, CFA ("Gary").

7. At all relevant times, Defendant Osprey is and has been an Illinois limited liability company that maintains its principal place of business in Cook County, Illinois. Osprey is a private equity firm with over $250 million of committed capital across a number of industries, with the primary goal of building businesses. At all relevant times, Osprey conducted business from, and its activities in connection with this action primarily took place in, the State of Illinois.

8. Defendant David is a Principal, Founder, and Managing Partner of Osprey. Upon information and belief, David is a resident of Cook County, Illinois. David is Gregory's father.

9. Defendant Gregory is also a Principal of Osprey. Upon information and belief, Gregory is a resident of Cook County, Illinois. Gregory is David's son.

## BACKGROUND FACTS

**(Iron Range Procures the Exclusive Rights to the Orange Line Transaction)**

10. On or about January 25, 2013, an investment banking brokerage firm (the "Selling Agent") contacted Gary about a potential transaction involving a lubricant oil distribution company. That same day, Iron Range executed a confidentiality agreement with the Selling Agent in order to review confidential information concerning said company and the potential transaction. The lubricant oil distribution company was Orange Line.

11. Based on the information that Iron Range received from the Selling Agent, Iron Range determined that Orange Line fit Iron Range's investment criteria. Iron Range concluded that Orange Line had strong, recurring cash flows and could be acquired at a reasonable purchase price, which made the potential transaction very valuable to Iron Range.

12. On February 18, 2013, Iron Range submitted a formal indication of interest ("IOI") to the Selling Agent identifying the reasons that Orange Line fit Iron Range's investment criteria, the enterprise valuation range contemplated by Iron Range, funding, due diligence and

other items contemplated by Iron Range in connection with its potential acquisition of Orange Line. In the IOI, Iron Range further stated:

> "As an active board member, we work with the CEO and management team to develop and implement strategic direction, evaluate and execute on add-on acquisitions, obtain any required financing, and assist in recruiting additional management or other needed resources. We believe in being strongly aligned with management and as a result institute compensation and management equity plans that provide proper incentive for increasing the value of the business."

13. Based upon the IOI, Iron Range was invited to continue discussions regarding a potential transaction involving Orange Line and conducted further due diligence, including reviewing documents made available through a virtual data room and attending a presentation of Orange Line's business by Orange Line management.

14. On or about April 12, 2013, Iron Range and Orange Line executed a letter of intent (the "April LOI") outlining the terms and conditions for the acquisition of 100% of the outstanding capital stock of Orange Line by Iron Range. The April LOI included a binding exclusive dealing clause pursuant to which Orange Line agreed to "immediately cease and terminate all activities, discussions and negotiations with all third parties (other than [Iron Range] and its affiliates) regarding any Alternative Transaction" concerning the sale of Orange Line, and further agreed not to participate in any such activities, discussions or negotiations with anyone other than Iron Range and its affiliates (the "Exclusivity Clause") prior to July 15, 2013.

**(The Defendants' Initial Involvement)**

15. Gary was first introduced to David and Gregory by a mutual acquaintance in June, 2013. Subsequently, Gary discussed, in general terms, with David and Gregory a potential acquisition of the lubricant distributor by Iron Range.

16. On or about June 24, 2013, Iron Range and Osprey executed that certain Confidentiality and Exclusivity Agreement dated June 24, 2013 (the "Non-Circumvention

4

Agreement"), a true and correct copy of which is attached hereto and made a part hereof as <u>Exhibit A</u>.

17. The Non-Circumvention Agreement, which had been issued by Iron Range to Osprey, expressly states:

    (a) "you acknowledge that Iron Range Capital Partners, LLC and/or its affiliates… have advised you that they are pursuing a transaction to effect the acquisition of a lubricant distributor in the West (the "Company");"

    (b) "The identity of the Company will be disclosed upon our receipt of an executed copy of this Agreement;"

    (c) "you will not pursue a Transaction with the Company without cooperation and authorization from [Iron Range], including [Iron Range's] written consent;"

    (d) "without the prior consent of [Iron Range], all communications from Osprey or Osprey's representatives regarding the proposed Transaction, requests for additional information, and discussions regarding procedures, will be directed only to [Iron Range] and not to the Company;"

    (e) "If a Transaction is consummated, this Agreement will remain in effect until all closing-related issues have been satisfied;" and

    (f) "This Agreement constitutes the full, complete, and final expression of the parties' understanding with respect to the subject matter hereof and can be changed only by a writing originally designated as an amendment and signed by the parties hereto."

18. Upon Iron Range's receipt of an executed copy of the Non-Circumvention Agreement from Osprey, Iron Range provided Osprey with substantial amounts of due diligence materials and internal analysis concerning Orange Line which Iron Range had assembled and/or prepared over the course of the prior five (5) months.

19. Over the course of the following four (4) days, Gary continued to discuss the potential acquisition of Orange Line with David and Gregory. During this time Gary also negotiated with David and Gregory the economic agreement between Iron Range and Osprey in the event that Osprey provided the subordinated debt and capital for the acquisition of Orange Line (the "Joint Ownership Agreement").

20. On June 28, 2013, Gary sent David an email, outlining the key provisions of Gary's understanding of the Joint Ownership Agreement, and asked David to "[p]lease acknowledge this is what we agreed to." Approximately twelve (12) minutes later, David sent Gary an email confirming the same, a true and correct copy of which email (the "Osprey Confirmation") is attached hereto and made a part hereof as <u>Exhibit B</u>.

21. As acknowledged in the Osprey Confirmation, Iron Range was to:

(a) receive $150,000 in cash payable to Iron Range at the closing on the acquisition of Orange Line;

(b) receive a fee of $62,500 per year for Gary's involvement in working with Orange Line's management team to grow Orange Line's business;

(c) be issued securities of Orange Line representing five percent (5%) of the securities issued to Osprey, the intent being "to issue to [Iron Range] the same securities as Osprey on a pari passu basis;"

(d) be guaranteed at least one (1) seat on Orange Line's board of directors; and

(e) among other additional rights, receive further compensation in connection with add-on acquisitions plus anti-dilution rights whereby Iron Range would "be issued additional securities to maintain the 5.0% [ownership interest] granted [to Iron Range] upon the initial purchase of Orange Line."

22. In reliance upon the Joint Ownership Agreement, Iron Range discontinued discussions with various third parties to partner with Iron Range to acquire Orange Line.

23. On or about July 1, 2013, Osprey issued a letter to Iron Range, signed by David, confirming that, subject to completion of its due diligence, Osprey was prepared to provide capital for the acquisition of Orange Line.

24. Believing that Iron Range and Osprey were teaming up to complete the acquisition of Orange Line together, Iron Range worked for the following several weeks to help Osprey complete its own due diligence and facilitate the closing on the acquisition of Orange Line, including providing additional documents and information relating to environmental

6

matters, facilitating a proposal from an independent accounting due diligence consultant, and facilitating an on-site meeting between Osprey and Orange Line management on July 15, 2013.

25. When the Exclusivity Clause in Iron Range's April LOI with Orange Line expired on July 15, 2013, Iron Range negotiated and executed a new letter of intent with Orange Line, dated July 19, 2013 (the "July LOI"). Like the April LOI, the July LOI outlined the terms and conditions for the acquisition of 100% of the outstanding capital stock of Orange Line by Iron Range. The July LOI also included exclusively language substantially the same as the language contained in the original Exclusivity Clause, but extended the exclusivity period to August 30, 2013.

**(The Defendants' Fraudulent Scheme)**

26. Iron Range provided Osprey with a copy of the signed July LOI on July 19, 2013. Upon Osprey's receipt of the July LOI, David asked Gary to replace the July LOI with a new letter of intent containing the same terms and conditions as the July LOI, but between Osprey and Orange Line instead of between Iron Range and Orange Line.

27. David informed Gary that it would be necessary for the letter of intent to be with Osprey in order for Osprey to obtain the financing that Osprey would require from its bank to consummate the Orange Line transaction (the "Bank Representation").

28. David further informed Gary that he should not be concerned about whether the letter of intent was with Osprey or Iron Range because Osprey would honor the economics of the Joint Ownership Agreement (the "Payment Representation").

29. In reliance upon the Bank Representation and the Payment Representation, Gary complied with David's request and, on July 22, 2013, Gary procured a new letter of intent

7

containing the same terms as the July LOI, but between Osprey and Orange Line (the "Osprey LOI").

30. In connection with its execution of the Osprey LOI, Orange Line required Iron Range to agree to confirm, in writing, that Iron Range's July LOI was null and void. Gary did so in an email to Orange Line and the Selling Agent dated July 22, 2013.

31. Upon information and belief, the Bank Representation was false and deceptive when made, and constituted a pretext which the Defendants used to induce Iron Range to relinquish the July LOI and procure the Osprey LOI. Osprey did not require the Osprey LOI in order to obtain financing and, with Iron Range's cooperation, could have relied on the July LOI to do so.

32. The Payment Representation was also false and deceptive when made.

33. Prior to Osprey's receipt of the Osprey LOI, David, Gregory and Osprey purported to honor the terms and conditions of the Non-Circumvention Agreement. Immediately after inducing Iron Range to procure the Osprey LOI, however, the Defendants began to circumvent the Non-Circumvention Agreement.

34. Prior to Osprey's receipt of the Osprey LOI, David, Gregory and Osprey had collaborated with Iron Range in connection with the Orange Line transaction, including on matters involving due diligence and financing. Immediately following receipt of the Osprey LOI, the Defendants performed an abrupt about-face by excluding Iron Range from meaningful participation in the Orange Line transaction, and by engaging in a pattern and practice of misrepresenting and omitting material facts regarding the status of the Orange Line transaction to Iron Range, as described herein, which were calculated by the Defendants to lull Iron Range into

8

continuing to believe that they would cause Osprey to honor the terms of the Joint Ownership Agreement.

35. The Defendants' stark reversals immediately after successfully inducing Iron Range to procure the Osprey LOI, and that they secretly closed on the acquisition of Orange Line as described below, demonstrate that David, Gregory and Osprey never intended to honor the terms of the Non-Circumvention Agreement or the Joint Ownership Agreement.

36. The scheme perpetrated by David, Gregory and Osprey described in Paragraphs 26 through 35 above is sometimes hereafter referred to as the "Scheme to Defraud."

**(The Defendants Consummate Their Scheme to Defraud,
and Exclude Iron Range From the Orange Line Transaction)**

37. On or about July 24, 2013, Gary arranged for Gregory, Cathleen Lloyd, Osprey's CFO ("Cathleen"), Guy Brandt, Osprey's attorney, and other Osprey representatives to all have access to Orange Line's data room.

38. On July 27, 2013, only five (5) days after the Osprey LOI was executed, Gary sent an email to David stating, "I am concerned about being completely out of the loop on many aspects of this transaction." On August 1, 2013, Gary sent an additional email to David and Cathleen stating that "[s]ome communication would be appreciated." In response, David replied: "Everything is on track have [the Selling Agent] call me."

39. On or about August 15, 2013, Osprey instructed the third party accounting due diligence firm to correspond directly with Osprey, and instructed said firm not to communicate with Iron Range.

40. On or about August 21, 2013, Osprey instructed the Selling Agent to direct all communications regarding Orange Line to Osprey, as opposed to Iron Range.

9

41.     Over the course of several days following August 21, 2013, Gary and David exchanged several communications during which David reassured Gary that he should not be concerned about the lack of involvement of Iron Range in the Orange Line transaction. David specifically informed Gary that Osprey is "not a group that needs a lot of hand holding" and that financing had been arranged and everything was proceeding toward a closing at the end of September. David further specifically told Gary that he would have his attorney get Iron Range the legal documents in sufficient time for Iron Range to review them before closing on the Orange Line transaction (the "Document Representation").

42.     Though it was obvious to Iron Range that Osprey desired to control the process leading to the acquisition of Orange Line, Iron Range relied on the Defendants' repeated representations that they would honor the Joint Ownership Agreement.

43.     On September 13, 2013, Gary requested an update from David concerning the status of the Orange Line transaction. David responded that the only update was that a vendor meeting was delayed until the end of the month. Gary understood and believed that obtaining consent from this vendor was the only issue delaying the closing on the acquisition of Orange Line by Iron Range and Osprey.

44.     In early October, 2013, Iron Range exchanged several emails with Osprey concerning an unidentified issue that Osprey was having with the vendor. While Iron Range offered to assist Osprey in handling the issue, Osprey declined to share any meaningful details about the issue or involve Iron Range in any vendor meetings.

45.     On October 16, 2013, Gary sent David an email stating, among other things:

"As I have consistently tried to do throughout the process, [Iron Range] would like to help Osprey in any way it can to move this deal towards closing. I have over 15 years' experience closing deals just like this one, and I'm confident that [Iron Range] can be helpful. Please let me know what the current issues are so that we can work together to

> get our deal back on track. The less [Iron Range] is involved and the less we know about the issues, the less we can help. Let's work together to get this deal done!"

In response to this email, David stated that he would call Gary to discuss the matter on Wednesday, October 23, 2013 (the "Call Representation"). David, however, did not do so.

46. On or about October 21, 2013, after the October 16, 2013, email exchange between Gary and David, and before the date that David said he would call Gary, the Defendants secretly closed on the acquisition of Orange Line.

47. The Defendants closed on the acquisition of Orange Line without complying with the Document Representation, without informing Iron Range that they were moving forward with the consummation of the Orange Line transaction, and without issuing any securities to Iron Range or providing Iron Range with any of the other consideration due and owing to Iron Range pursuant to the Joint Ownership Agreement.

48. On October 29, 2013, and again on November 6, 2013, Gary sent follow-up emails to David without receiving a timely response. On November 7, 2013, Gary first discovered, through a source other than Osprey, that the Orange Line transaction had closed seventeen (17) days earlier, on October 21, 2013.

49. The following day, on November 8, 2013, Gary and David exchanged emails concerning a potential settlement of Iron Range's claims against Osprey in connection with Osprey having excluded Iron Range from the Orange Line transaction. No settlement was reached, however, and Osprey has still failed and refused to issue any Orange Line securities to Iron Range, or provide Iron Range with any of the other consideration due and owing to Iron Range pursuant to the Joint Ownership Agreement.

## COUNT I

## AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND SEC RULE 10b-5

50. Iron Range repeats and realleges Paragraphs 1 through 49 as if stated in their entirety herein.

51. The five percent (5%) equity interest in Orange Line required to be issued to Iron Range in connection with the closing on the purchase of Orange Line constitutes "securities" as defined in Section 3(10) of the Securities Exchange Act of 1934, 15 U.S.C. §78c(10).

52. It is obvious that (i) Gregory, on behalf of Osprey executed the Non-Circumvention Agreement while secretly intending never to honor its terms, (ii) David and Gregory, on behalf of Osprey, negotiated the Joint Ownership Agreement with Iron Range while secretly intending never to honor its terms, and (iii) David, on behalf of Osprey, sent the Osprey Confirmation of the Joint Ownership Agreement while secretly intending never to honor its terms.

53. The Non-Circumvention Agreement and the Joint Ownership Agreement were each entered into between Osprey and Iron Range while Iron Range maintained the exclusive right to acquire 100% of the outstanding capital stock of Orange Line. But for the Bank Representation and the Purchase Representation, Iron Range would not have foregone its July LOI or procured the Osprey LOI.

54. After receiving the Osprey LOI, Osprey immediately then repeatedly excluded Iron Range from any meaningful participation in the Orange Line transaction, and ultimately closed on the acquisition of Orange Line in secret, without involving or informing Iron Range, and without conveying any of the consideration due and owing to Iron Range pursuant to the Joint Ownership Agreement.

55. Prior to closing on the acquisition of Orange Line, the Defendants made further misrepresentations and material omissions to Iron Range calculated to lull Iron Range into continuing to believe that they would cause Osprey to honor the terms of the Joint Ownership Agreement including, among others, the Document Representation and the Call Representation. Iron Range did not learn of the Defendants' Scheme to Defraud until after the Defendants secretly closed on the acquisition of Orange Line.

56. If Iron Range had been aware of the Defendants' Scheme to Defraud, Iron Range would never have: (i) disclosed the Orange Line transaction to the Defendants; (ii) provided Osprey with Iron Range's confidential analysis of the Orange Line transaction and due diligence results; (iii) discontinued discussions with various third parties to partner with Iron Range to acquire Orange Line; (iv) procured the Osprey LOI and relinquished Iron Range's July LOI; or (v) stood by while Osprey worked toward completing the Orange Line transaction.

57. As a direct and proximate result of Defendants' Scheme to Defraud, Iron Range has been injured in its business and property in an amount exceeding One Million Eight Hundred Thousand and No/100 U.S. Dollars ($1,800,000.00).

58. By perpetrating their Scheme to Defraud, the Defendants have violated Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

**WHEREFORE**, Iron Range respectfully prays for entry of judgment in its favor and against Defendants and for relief from the Defendants as follows:

A. An award of damages in an amount to be determined at trial;

B. An award of consequential damages, including but not limited to, the costs, fees and expenses incurred by Iron Range as a result of prosecuting this action; and

C. Such other relief as the Court deems just and appropriate.

## COUNT II

### AGAINST THE DEFENDANTS FOR VIOLATION OF
### THE ILLINOIS SECURITIES LAW OF 1953 (815 ILCS 5/12)

59. Iron Range repeats and realleges Paragraphs 1 through 49 and Paragraphs 51 through 57 as if stated in their entirety herein.

60. By perpetrating their Scheme to Defraud, the Defendants have violated Section 12 of the Illinois Securities Law of 1953.

**WHEREFORE**, Iron Range respectfully prays for the entry of judgment in its favor and against Defendants and for relief from the Defendants as follows:

A. An award of damages in an amount to be determined at trial;

B. An award of consequential damages, including but not limited to, the costs together with the reasonable attorneys' fees and expenses incurred by Iron Range as a result of prosecuting this action; and

C. Such other relief as the Court deems just and appropriate.

## COUNT III

### AGAINST THE DEFENDANTS FOR FRAUD

61. Iron Range repeats and realleges Paragraphs 1 through 49 and Paragraphs 51 through 57 as if stated in their entirety herein.

62. By perpetrating their Scheme to Defraud, the Defendants are liable to Iron Range for common law fraud.

**WHEREFORE**, Iron Range respectfully prays for entry of judgment in its favor and against Defendants and for relief from the Defendants as follows:

A. An award of damages in an amount to be determined at trial;

B.     An award of punitive and consequential damages, including but not limited to, the costs together with the reasonable attorneys' fees and expenses incurred by Iron Range as a result of prosecuting this action; and

C.     Such other relief as the Court deems just and appropriate.

## COUNT IV

## AGAINST OSPREY FOR BREACH OF THE NON-CIRCUMVENTION AGREEMENT

63.    Iron Range repeats and realleges Paragraphs 1 through 49 as if stated in their entirety herein.

64.    Iron Range and Osprey entered into and executed the Non-Circumvention Agreement attached hereto as <u>Exhibit A</u>.

65.    Osprey intentionally breached the Non-Circumvention Agreement by, among other things (i) excluding Iron Range from the Orange Line transaction once the Osprey LOI replaced Iron Range's July LOI, and (ii) closing on the Orange Line transaction on terms and conditions not authorized by Iron Range.

66.    As a direct and proximate result of Osprey's breaches, Iron Range has been injured in its business and property in an amount exceeding One Million Eight Hundred Thousand and No/100 U.S. Dollars ($1,800,000.00).

**WHEREFORE**, Iron Range demands relief from Osprey as follows:

A.     An award of damages in an amount to be determined at trial; and

B.     Such other relief as the Court deems just and appropriate.

## COUNT V

## AGAINST OSPREY FOR BREACH OF THE JOINT OWNERSHIP AGREEMENT

67. Iron Range repeats and realleges Paragraphs 1 through 49 as if stated in their entirety herein.

68. Iron Range and Osprey entered into the Joint Ownership Agreement as evidenced by the Osprey Confirmation attached hereto as Exhibit B.

69. Osprey intentionally breached the Joint Ownership Agreement by, among other things: (i) failing to issue Orange Line securities to Iron Range in the amount of five percent (5%) of the securities issued to Osprey on a pari passu basis; (ii) failing to pay Iron Range the amount of One Hundred Fifty Thousand and No/100 U.S. Dollars ($150,000.00) at the closing of the Orange Line transactions; and (iii) failing to appoint Gary Stark to the board of directors of Orange Line and make payments toward the $62,500.00 annual board fee.

70. As a direct and proximate result of Osprey's breaches, Iron Range has been injured in its business and property in an amount exceeding One Million Eight Hundred Thousand and No/100 U.S. Dollars ($1,800,000.00).

**WHEREFORE**, Iron Range demands relief from Osprey as follows:

A. An award of damages in an amount to be determined at trial; and

B. Such other relief as the Court deems just and appropriate.

## COUNT VI

## AGAINST THE DEFENDANTS FOR UNJUST ENRICHMENT
## (IN THE ALTERNATIVE)

71. Iron Range repeats and realleges Paragraphs 1 through 49 as if stated in their entirety herein.

16

72. At all relevant times, Iron Range possessed the exclusive right to consummate the acquisition of Orange Line pursuant to the terms and conditions of the April LOI and the July LOI.

73. Iron Range had invested many months of due diligence, negotiations and other efforts to close the Orange Line transaction for its own benefit.

74. By perpetrating their Scheme to Defraud, the Defendants unjustly induced Iron Range to forfeit its rights under the July LOI and to transfer those rights to Osprey.

75. The Defendants then closed on the Orange Line transaction in secret, and received the full benefit thereof, without any compensation to Iron Range.

76. Defendants' continued retention of such benefit to the detriment of Iron Range violates fundamental principles of justice, equity, and good conscience.

77. Defendants' conduct caused Iron Range to suffer the damages described herein.

**WHEREFORE**, Iron Range demands relief from the Defendants as follows:

A. An award of damages in an amount to be determined at trial;

B. An award of punitive and consequential damages, including but not limited to, the costs together with the reasonable attorneys' fees and expenses incurred by Iron Range as a result of prosecuting this action; and

C. Such other relief as the Court deems just and appropriate.

## COUNT VII

### AGAINST THE DEFENDANTS FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

78. Iron Range repeats and realleges Paragraphs 1 through 49 as if stated in their entirety herein.

79. At all relevant times, Iron Range had a reasonable expectancy of consummating a transaction involving the acquisition of Orange Line for the benefit of Iron Range.

80. At all relevant times, Defendants were in possession of the April LOI and the July LOI, and were aware of Iron Range's legitimate expectancy of consummating the acquisition of Orange Line for the benefit of Iron Range.

81. By perpetrating their Scheme to Defraud, the Defendants intentionally and without justification interfered with Iron Range's expectancy of consummating a transaction involving the acquisition of Orange Line for the benefit of Iron Range.

82. By perpetrating their Scheme to Defraud, the Defendants acquired Orange Line without any benefit to Iron Range.

83. As a direct and proximate result of Defendants' actions, Iron Range has been injured in its business and property.

**WHEREFORE**, Iron Range demands relief from the Defendants as follows:

A. An award of damages in an amount to be determined at trial;

B. An award of punitive and consequential damages, including but not limited to, the costs together with the reasonable attorneys' fees and expenses incurred by Iron Range as a result of prosecuting this action; and

C. Such other relief as the Court deems just and appropriate.

Dated: February 24, 2014                    Respectfully submitted,

                                                     **IRON RANGE CAPITAL PARTNERS, LLC**

By: /s/ Jeffrey E. Kopiwoda
One of its attorneys

Damon E. Dunn (ARDC #: 6180629)
Jeffrey E. Kopiwoda (ARDC #: 6229616)
Seth A. Stern (ARDC #: 6300954)
Cecilia M. Suh (ARDC #: 6314100)
Funkhouser Vegosen Liebman & Dunn Ltd.
55 West Monroe Street, Suite 2300
Chicago, Illinois 60603
V: (312) 701-6800
F: (312) 701-6801